UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

HOFFMANS TRADE GROUP LLC,

                    Debtor

Chapter 7
Case No. 13-11662-REL

MARC S. EHRLICH, AS TRUSTEE FOR
HOFFMANS TRADE GROUP LLC,

                    Plaintiff

   v.

MCLANE GLOBAL, JORDAN LACCETTI,
and MICHAEL COAKLEY

                  Defendants.

Adv. Pro. No.15-90038

**LOCAL RULE 7056-1 STATEMENT OF MATERIAL FACTS
NOT IN DISPUTE IN SUPPORT OF TRUSTEE'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO BANKRUPTCY RULE 7056**

Plaintiff, Marc Ehrlich, as Trustee for Hoffmans Trade Group LLC ("Trustee"), by and through his counsel, Deily & Glastetter, LLP, submits this Statement of Undisputed Material Facts in support of its Motion for Summary Judgment Pursuant to Bankruptcy Rule 7056 against Defendants, McLane Global ("McLane"), Jordan Laccetti ("Laccetti") and Michael Coakley ("M. Coakley") (collectively the "Defendants"), and in accordance with Local Rule 7056-1 states as follows:

**THE PARTIES AND PROCEDURAL HISTORY**

1.     Hoffmans Trade Group LLC (hereinafter referred to as "Debtor" or "HTG") entered bankruptcy through the filing of an involuntary petition on June 28, 2013, which was amended on July 19, 2013. The Debtor did not contest the involuntary filing (*see* ECF Doc. No. 1).

1910049

2. The Debtor is a domestic limited liability company, duly organized under the laws of the State of New York, with a principal place of business at 637 Loudon Road, Latham, New York 12110 (*see* Def. MSJ Exhibit 3 at pp 9 and 10)[1].

3. Gael Coakley ("G. Coakley") of 12 Glennon Road, Latham, New York 12110, is the sole member and owner of HTG (*see* Def. MSJ Exhibit 3 at pp. 9, 10).

4. Defendant McLane is a Texas corporation headquartered at 16607 Central Green Blvd. #400, Houston, Texas 77032 (*see* Def. MSJ Exhibit 1 at ¶ 8).

5. Defendant Laccetti is a natural person with a place of residence in the Capital District (*see* Def. MSJ Exhibit 1 at ¶ 9).

6. Defendant M. Coakley is a natural person with a place of residence in Houston, Texas (*see* Def. MSJ Exhibit 1 at ¶ 10).

7. On or about July 31, 2015, the Trustee filed an Adversary Complaint against Defendants seeking, among other things, monetary damages for causes of action related to the misappropriation of trade secrets (*see* ECF Doc. No. 95).

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

9. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O).

10. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408, 1409(a), and 28 U.S.C. § 1391 because McLane is subject to personal jurisdiction in this judicial district.

11. This proceeding has been brought in accordance with Fed. R. Bankr. P. 7001.

12. On January 15, 2014, McLane filed its proof of claim (Claim No. 11-1), asserting a claim against Debtor in the amount of $234,718.11.

---

[1] All references to page numbers in deposition transcripts are to the transcripts' numbering and not the numbering of the .pdf document.

1910049                                                    2

**UNDISPUTED FACTS**

13. The Debtor is/was a single member LLC owned by G. Coakley (*see* Def. MSJ Exhibit 3 at pp. 9, 10).

14. The Debtor was formed in 2008 originally as Georgia LLC. It was formed as a New York LLC in February 2011 (*Id.*).

15. Although it sold raw materials, such as diaper fluff, the Debtor was primarily engaged in selling canned food products to food banks all around the country (*see* Def. MSJ Exhibit 3 at p. 10).

16. For all times relevant to this action, the Debtor was located in an office at 637 New Loudon Road in Latham, New York (*see* Def. MSJ Exhibit 3 at pp. 15, 16).

17. The Debtor was a food broker, in that it had distributors or manufacturers that it bought canned food from and then resold to food banks (*see* Def. MSJ Exhibit 3 at p. 12).

18. The Debtor's normal business practice was never to take possession of the food product but instead have it shipped directly from the distributor or manufacturer to the customer (*Id.*).

19. The Debtor kept its physical files in filing cabinets in the accounting office (*see* Def. MSJ Exhibit 3 at p. 36).

20. The Debtor's electronic financial information was kept in the Quickbooks software program (*Id.*).

21. Each sales employee had a computer that was located in that employee's office at 637 New Loudon Road, Latham, New York (*see* Def. MSJ Exhibit 3 at p. 35).

22. All of the computers at HTG were password protected and HTG employed rigorous methods to protect its computer servers (*see* Def. MSJ Exhibit 6 at p. 18).

23. None of the Customer Data was shared on HTG's website.

24. HTG locked its doors and did not grant access to its stored computer drives or its paper files to anyone other than its employees.

25. HTG employed rigorous precautionary measures to preserve its customer lists and Customer Data as secret.

26. HTG developed its Customer Data through considerable effort, over several decades, and kept it in confidence as it was not readily available through any public means (*see* Def. MSJ Exhibit 5 at p. 75).

27. HTG employed a unique combination of efforts with resulted in a unified process, design and operation which afforded it a competitive advantage in the food purveying business. This advantage is evidenced by the interest McLane demonstrated in acquiring HTG.

28. Laccetti began his employment with HTG in 2010 (*see* Def. MSJ Laccetti Aff. at ¶ 4).

29. At all times during his employment with HTG, Laccetti was an "at will" employee not subject to any employment agreement, restrictive covenant agreement, non-compete agreement, non-solicitation agreement or any other similar agreement (*see* Def. MSJ Laccetti Aff. at ¶ 3).

30. Laccetti did not receive a phone for work with HTG (*see* Def. MSJ Exhibit 6 at p. 77).

31. During his employment with HTG, Laccetti was primarily a salesman of food products to food banks (*see* Def. MSJ Laccetti Aff. at ¶ 6).

32. M. Coakley, son of G. Coakley, began working part-time for HTG in September 2010 (*see* Def. MSJ M. Coakley Aff. at ¶ 2).

33. M. Coakley's day-to-day job duties while employed full-time by HTG were to reach out to food banks, inquire about their needs, and to sell product that HTG had the ability to purchase to food banks (*see* Def. MSJ M. Coakley Aff. at ¶ 2).

1910049                                4

34. At all times during his employment with HTG, M. Coakley was an "at will" employee not subject to any employment agreement, restrictive covenant agreement, non-compete agreement, non-solicitation agreement or any other similar agreement (*see Def.* MSJ M. Coakley Aff. at ¶ 3).

35. M. Coakley and Lacetti were involved in the day-to-day contact with each and every customer of HTG (*see* Def. MSJ Exhibit 6 at p. 87).

36. M. Coakley and Laccetti were involved in the day-to-day development of customer relationships and had access to all of HTG's customer contact information (including business phone numbers, names of business's decision makers, cell phone numbers); customer order preferences (including item, quantity, frequency and pricing); customer profiles; trade secrets; wholesale quantity purchase pricing history; recorded detail about each customer; customer invoices; pricing strategies; order histories; annual consumption data; and rates paid by customers (hereinafter referred to as "Customer Data") (*Id.*.).

37. In or about February 2013, HTG sought to sell its entire business to McLane (*see* Def. MSJ Exhibit 4 at p. 10).

38. In or about February 2013, Todd Frease ("Frease"), CFO for McLane, came to visit HTG in Latham, NY to discuss the acquisition of HTG (*see* Def. MSJ Exhibit 4 at p. 10).

39. HTG prepared a formal written offer to McLane for the sale of HTG and its Customer Data and employees for One Million Five Hundred ($1,500,00.00) Dollars (*see* Def. MSJ Exhibit 4 at p. 15).

40. McLane declined the written offer from HTG (*see* Def. MSJ Exhibit 4 at p. 15).

41. Frease was deposed under oath at the undersigned's office on March 8, 2016 and stated that he knew the customer base of HTG belonged to HTG and not to the individual employees, M. Coakley and Laccetti (*see* Def. MSJ Exhibit 4 pp. 28-31).

1910049                                5

42. Frease further testified that McLane prepared a Power Point presentation outlining the benefits of acquiring HTG's employees and customer base for both HTG and McLane. Frease further testified this Power Point presentation was provided to G. Coakley (*see* Def. MSJ Exhibit 4 p. 69).

43. On April 2, 2013, Frease sent an email to Drayton McLane, owner of McLane, and Webb Stickney ("Stickney"), his assistant, with a copy to Denton McLane (Drayton's son) and Michael Julian ("Julian"), CEO of McLane, outlining the proposed transaction wherein McLane would acquire the salesmen, M. Coakley and Laccetti and the customer base for a "fixed cost plus commission on growth". The details of the email are contained therein and the CFO placed a value of $500,000.00 on the present business of HTG. A copy of Frease's April 2, 2013 email is attached hereto as **Exhibit "A"**.

44. As McLane watched HTG's financial condition throughout April 2013, McLane prepared and provided to G. Coakley a Power Point presentation outlining the advantages for HTG as the following:

- Monetize four (4) years of start up work
- Provide Jordan and Michael to further their success and build a lasting career.
- Allow HTG to focus on only the recycled fluff, with a higher margin, less cash intensive business.
- Allow HTG (Gael) to minimize time spent coordinating capital needs and day to day administrative functions.
- To maximize the value of HTG by quantifying the growth and future growth of the food bank business attributed to HTG.

McLane further outlined the factors that determined value placed on HTG:

- By combining HTG and McLane Global Food Bank Business, opportunities for growth are great.
- McLane Global is proposing to acquire a customer list and two (2) salesmen.

- The current business for HTG generates approximately $7 million in sales, but minimal profit (approximately $12,000 annually)
- Incremental profitability from McLane is driven by the following:
    - Infusion of capital-savings on financing
    - Reduced OGA expense compared to HTG
    - Sales growth for Michael and Jordan

- Transaction risk
    - HTG will still exist and salesmen will be located in New York.
    - Although we can establish employee contract, we have very little means of restricting salesmen from leaving.

Thereafter McLane created a Proposal that would provide HTG with 20% of gross profit on all of M. Coakley and Laccetti's business including <u>any</u> new business for three (3) years with payments to be made on a quarterly basis. McLane prepared a Pro Forma for the anticipated growth in sales indicating that HTG would anticipate a three (3) year profit of $644,250.00 if HTG had accepted this revised proposal. A copy of the Power Point presentation is attached hereto as **Exhibit "B"**.

45. G. Coakley entered a rehabilitation program in April 2013 and McLane knew of this at least as early as May 3, 2013 (*see* Def. MSJ Exhibit 4 p 84).

46. McLane acquired HTG's employees, M. Coakley and Laccetti, on May 6, 2013.

47. HTG did not acquiesce to the acquisition of HTG employees and Customer Data by McLane.

48. McLane's paid nothing ($0.00) to HTG for the acquisition of HTG's employees and Customer Data.

49. Upon acquisition of the employees and Customer Data, McLane immediately began to service all of HTG's customers.

50. McLane obtained a competitive advantage over HTG's creditors and competitors without payment for that advantage.

1910049                                        7

51. McLane did not act in good faith when it acquired HTG's employees and Customer Data.

52. McLane's conduct alleged above is and was inequitable and without good faith.

53. Laccetti testified that he did not take any of the Customer List belonging to HTG with him to McLane (*see* Def. MSJ Exhibit 6 pp. 73-75, 80).

54. Laccetti falsely testified that he only used his personal email account to receive his employment contract from McLane (*see* Def. MSJ Exhibit 6 at pp. 79-80). Laccetti further testified that he started working with McLane on May 6, 2013 (*see* Def. MSJ Exhibit 6 at p. 59). However, McLane produced emails from their servers indicating that Laccetti sent information to McLane regarding HTG pending sales on May 2, 2013 from his personal email (*see* **Exhibit "C"**). Four (4) days prior to being employed by McLane, Laccetti was sharing HTG confidential sale data for at least eight (8) HTG customers with order detail.

55. Laccetti testified that he had committed to memory the names and contact information for 40-50 customers of HTG. He also testified he would have tracked down the customer information for HTG customers via the internet (*see* Def. MSJ Exhibit 6 p.74). However, even after tendering his written resignation to HTG and signing his employment agreement with McLane, on May 7, 2013, Laccetti wrongfully and illegally accessed his former HTG email account and forwarded a HTG email dated November 13, 2012 containing confidential customer contact information and customer preferences to his new email address at McLane. A copy of the May 7, 2013 email is attached hereto as **Exhibit "D"**.

56. Further, Laccetti wrongfully and illegally accessed his former HTG email account and forwarded a HTG email dated May 7, 2013 containing confidential customer contact information and customer preferences to his new email address at McLane. A copy of the second May 7, 2013 email is attached hereto as **Exhibit "E".**

1910049                                8

57. Thereafter, Laccetti took a customer order sent to HTG and advised the HTG customer of his new email address and indicated he would get back to the customer shortly. It should be noted that this HTG customer was seeking the forecast for the future May through December order, exactly the information the Trustee asserts in his Complaint is proprietary and confidential and Laccetti stole that information from HTG. A copy of Laccetti's response email to HTG customer is attached hereto as **Exhibit "F"**.

58. Yet again, Laccetti wrongfully and illegally accessed his former HTG email account and forwarded a HTG email dated May 8, 2013 to his new email address at McLane. A copy of the May 8, 2013 email is attached hereto as **Exhibit "G".**

59. Laccetti sent an email to his McLane boss, Rick Bullock ("Bullock") and copied M. Coakley on May 6, 2013, his first day of work, indicating his intent with regards to contacting "…our customers and make phone calls to them we'd like to return to sending out 1-2 featured items or opportunity buys per day." Laccetti goes on further in that email to outline to Mr. Bullock why he wants to utilize the opportunity buy process from HTG, explaining "The reason we send out the email blasts is two fold. The main reason is to try to sell the product but the ancillary benefit is the 'touch'. Just keeping our names in front of them…..often people will respond to these "blasts" with products they are looking for at that time." A copy of Laccetti's May 6, 2013 email is attached hereto as **Exhibit "H".** Laccetti breached his duty of loyalty to HTG and shared confidential Customer Data and process with McLane.

60. On May 6, 2013, Bullock emailed Laccetti that "I would like to start including Michael's and your customers as soon as we can add them to the Broadcast Listing". A copy of Bullock's May 6, 2013 email is attached hereto as **Exhibit "I".** However, Laccetti indicated in his deposition testimony that he did not have any customers and the customers belonged to HTG (*see* Def. MSJ Exhibit 6 at p. 65).

61. By email dated Monday, May 6, 2013, M. Coakley advised an HTG customer of his new email address and requested that the customer remove the HTG email address from their bid list. A copy of M. Coakley's May 6, 2013 email is attached hereto as **Exhibit "J"**.

62. M. Coakley sent an email dated May 14, 2013 to Frease at McLane indicating that "All of our customers are thrilled as well. Good times are ahead." in a subject line indicating that "$160k in the pipeline" for sales. A copy of the May 14, 2013 email to Frease is attached hereto as **Exhibit "K"**. M. Coakley has previously testified that the customers were the customers he had been working with at HTG (*see* Def. MSJ Exhibit 5 at p. 122).

63. Despite J. Laccetti testifying that he did not make any copies of HTG's list of customers or customer data during his testimony under oath (*see* Def. MSJ Exhibit 6 at p. 80), Laccetti sent a detailed email on May 15, 2013 to one of his contacts obtained at HTG regarding pricing that was sent to Laccetti while he was employed in the prior months at HTG. Laccetti's email contains very detailed information regarding both price per case, per unit, per pack and including shipment information which cannot logically be retained in his memory a copy of which is attached hereto as **Exhibit "L"**.

64. Laccetti took the unit pricing and shipping information from HTG and utilized it to his advantage and to the advantage of his employer, McLane. Despite the many assertions by Laccetti, M. Coakley and Frease that the contact information for all of the food bank customers was readily available online during their deposition testimony (*see* Def. MSJ Exhibits 4, 5 and 6), Frease sent an email on May 17, 2013 asking Laccetti and M. Coakley for the contact information for a HTG customer, Superior Foods Company. M. Coakley responded to his boss, Frease, providing the name of the Credit Manager for Superior Foods Company with her telephone number, her toll-free number and her fax number. A copy of the email chain between Frease and M. Coakley is attached hereto as **Exhibit "M"**.

65. Laccetti testified that once he began his employment at McLane, he could reach out to either Bullock or Frease, who were McLane employees (*see* Def. MSJ Exhibit 6 at p. 75).

66. Bullock, a McLane employee, sent an email on June 1, 2013 to both Laccetti and M. Coakley with the subject line of ""Old" HTG Orders" with an attachment. Mr. Bullock asked if there was "any way to revive". The email attachment includes a purchase order from HTG for instant mashed potatoes to be sent to an undisclosed customer of HTG through its supplier in this instance, McLane Global. Thus, evidencing McLane's attempt to obtain access to HTG Customer Data and preferences. A copy of Bullock's June 1, 2013 email with attachment is attached hereto as **Exhibit "N"**.

67. On Saturday, June 1, 2013, M. Coakley responded to Bullock's email request indicating "My original customer for this (second harvest heartland) has removed this item from their menu. I believe we sold a TL to NJ Community Food Bank and Central PA Food Bank as well. I will check to see if they have any interest in a reorder." M. Coakly again utilized the customer data and preferences available to him only at HTG for the benefit of McLane. A copy of M. Coakley's June 1, 2013 email is attached hereto as **Exhibit "O"**.

68. On May 14, 2013, eight (8) days after Laccetti and M. Coakley started with McLane Global, Drayton McLane, owner, had his assistant, Stickney, send an email to Denton McLane, Frease and Julian under the subject line "Hoffman's Transaction" with a body requesting an update on this. Thereafter, Frease prepared an email response that same day stating:

> "Jordan and Michael started with us last Monday and the sales are coming in. Transition went smoothly and customers seem to be accepting. They will be here Monday for indoctrination into our systems and meet everyone. They have $160,000 in open orders and we already shipped about $100k."

It is important to note that the assistant to the owner of the company continued to see this transaction as related to HTG, the Debtor. A copy of the May 14, 2013 Stickney email is attached hereto as **Exhibit "P"**.

69. M. Coakley prepared an email to his bosses, Julian and Bullock at McLane on May 20, 2013 stating:

> "Food bank contact list is attached. I exported it from my outlook so it contains all food bank customer emails and some phone numbers. I removed all Texas fb customers a couple of weeks ago".

The attachment to his email contains the email addresses for over ninety (90) food bank customers of HTG. M. Coakley in no way indicates that he obtained this information from the internet but rather from his own outlook email further evidencing the misappropriation of HTG Customer Data by M. Coakley and McLane. A copy of the M. Coakley May 20, 2013 email is attached hereto as **Exhibit "Q"**. The Customer List has been redacted but a copy has been provided to counsel for the Defendants and the Court.

Dated: September 7, 2016

/s/ Leigh A. Hoffman
Leigh A. Hoffman, Esq.
DEILY & GLASTETTER, LLP
*Attorneys for Chapter 7 Trustee*
8 Thurlow Terrace
Albany, New York 12203
Tel: (518) 436-0344
Fax: (518) 436-8273
Email: lhoffman@deilylawfirm.com