UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

---

In re:

HOFFMANS TRADE GROUP LLC,

Debtor

Chapter 7
Case No. 13-11662 - REL

---

MARC S. EHRLICH, AS TRUSTEE FOR
HOFFMANS TRADE GROUP LLC,

          Plaintiff

v.

MCLANE GLOBAL, JORDAN LACCETTI, and
MICHAEL COAKLEY,

          Defendants.

Adv. Pro. No. - 15-90038-1

Hearing Date: November 16, 2016
9:15 A.M., US Bankruptcy Court
Albany, NY

---

### AFFIDAVIT OF JORDAN LACCETTI

Jordan Laccetti, being duly sworn, deposes and says:

1. That I am one of the named Defendants in the above matter. As such, I have personal knowledge of the facts and circumstances involved in this case. I make this affidavit in opposition to the Trustee's motion for summary judgment.

### THE TRUSTEE'S CLAIMS REGARDING MY EMAILS ARE COMPLETELY INACCURATE AND MISLEADING

2. In an attempt to overcome the lack of any witnesses to support its claims, the Trustee has selected seven or eight of my emails, and in its statement of uncontested facts attempts to make legal conclusions regarding those emails which simply have no basis in fact. Set forth below, I

explain how each one of my emails the Trustee has selected does not contain any trade secret information or support the Trustee's contentions. I would note that, in discovery, I provided to the Trustee all of my McLane emails.

3. **Exhibit C** - This is an email I forwarded from my personal email to McLane regarding previous orders that had been placed by those specific food banks with McLane. While the Debtor was the party that brought about the transaction, because the Debtor was so far in arrears with McLane, McLane had, in late winter/early spring 2013, stopped agreeing to sell directly to the Debtor and, instead, required that any transaction initiated by the Debtor be a direct contract to sell between McLane and that particular food bank. The purpose of this email was simply to follow-up with McLane on the status of the shipments for those direct contracts. Because I had an ongoing relationship with the food banks in the email, and I was potentially soon to be working for McLane, I wanted to make sure that the customer got the product they had ordered so that the relationships could be maintained. The Trustee's claim that the email contained confidential sales data is completely ridiculous (see Trustee's Statement of Material Facts at ¶ 54), as McLane already knew all of the details of each order since it was the vendor for each sale and was billing each food bank separately.

4. **Exhibit D and Exhibit E** - These two exhibits contain related emails regarding pricing from a vendor of shelf stable milk. On May 7, 2013, I received an unsolicited email to my Hoffmans email account from a representative of Indulac, a vendor of shelf stable milk, informing me of a price change. The email itself, however, did not have any specifics about how Indulac packages their product. I remembered that I had sent a quote via email to a customer several months before with specifics, so I searched through emails from my phone and found the email from November 13, 2012 in Exhibit D and forwarded it to myself so I would have that information.

While I chose to find the specs about the shelf stable milk in my Hoffman's email, I absolutely could have called Indulac, whether employed by the Debtor or McLane, and they would have given me this information. Furthermore, there was nothing in the pricing quote that was exclusive to the Debtor, such that McLane, had they wanted to purchase, could have done so at the price given by Sonia Gonzalez. As it turned out, McLane had no use for shelf stable milk and never made any purchases from Indulac. I searched for the specs on the milk only because I wanted to see how the product came in case there was ever a need for it, and not because McLane asked me to or somehow could not have found that information on its own.

As such, there is simply no merit to the Trustee's argument that these emails contained "confidential customer contact information and customer preferences" (see Trustee's Statement of Material Facts at ¶ 555 and 56). The email was from a vendor and not a customer of the Debtor, and contained information that any interested buyer could have obtained.

5. **Exhibit F** - This is a copy of my email back to Sonia Gonzalez relating to Exhibits D and E. As I stated above, McLane never ended up purchasing any Indulac shelf stable milk, so I likely never responded to Ms. Gonzalez. Once again, the Trustee's assertion that this email shows that I "took a customer order sent to HTG"(see Trustee's Statement of Material Facts at ¶ 57) is completely false and misleading. Indulac was not a customer of the Debtor nor would it ever be. Indulac was a vendor of shelf stable milk. There would be nothing proprietary or confidential about the prices that Indulac was selling its milk for.

6. **Exhibit G** - This is an inter-office email about a sale I received to my Hoffmans email account from Abigail Griffith, a McLane employee. Ms. Griffith inadvertently sent it to my Hoffman's email probably because she had previously emailed with me when I worked for the Debtor and her email auto-saved and when she went to type my name to address the email it first

brought up my Hoffmans email account and she clicked that by mistake.

7.    **Exhibit H** - This is an email I sent to Rick Bullock on my first day working at McLane. Basically, I am just sharing with him my sales philosophy to create "touches" with the customers because Mr. Bullock was in charge of procurement so I wanted to let him know what had worked for me in the past and what I think McLane might consider doing in the future. The Trustee, in a tortured attempt to create an issue with this email where none exists, claims that my email to Bullock is explaining why I "want to utilize the opportunity buy process from HTG" (see Trustee's Statement of Material Facts at ¶ 59) The assertion that an opportunity buy is a process unique or secret to HTG is completely untrue. An opportunity buy is a common term in the industry and refers to a good deal on a product that stems from the product being close to its expiration date or some other reason that would cause the product to be less expensive than it otherwise normally would be. There is certainly nothing secret or unique about opportunity buys that only the Debtor knew. Any competitor in the industry would know what an opportunity buy was and how to find them.

8.    **Exhibit I** - This is an email Rick Bullock sent to me on my first day of employment with McLane. He is explaining to me that as M.Coakley and I get assigned customers from McLane and pick up new customers to sell to going forward, he was going to add those customers to the "Broadcast Listing," which is essentially advertising material for McLane products that McLane broadcasts to food banks. The Trustee claims that this email shows I was not truthful when I testified that I did not previously "have any customers and the customers belonged to HTG" (see Trustee's Statement of Material Facts at ¶ 60). It is not at all clear to me how or why the Trustee makes this claim, since in the email Bullock is referring to McLane customers being assigned to M.Coakley and I, not the Debtor's customers.

However, it should be made clear to the Court that the Trustee's continued insistence on the

concept that food bank customers "belong" to the Debtor, or to McLane or to me or M.Coakley, is completely off-base and misleading. The inference the Trustee is attempting to make is that if the Debtor sold to a particular customer, that customer "belonged" to the Debtor such that no other competitor could sell product to it at some other point in time and that M.Coakley and I would, therefore, be prevented from selling to the Debtor's customers if we worked for McLane. But, the fact of the matter is that there are no exclusive buy/sell contracts between food banks and vendors. Therefore, food banks are free to buy from any vendor at anytime, without restriction and certainly do not "belong" to the Debtor, or belong to me or M.Coakley just because we say "our customers." Using that phrase is just an easy way to refer to the customers that we sell to. It is not meant to imply anything other than that.

9.  **Exhibit L** - This is an email I sent in mid-May 2013 to a hot dog vendor confirming a previous price quote. This email came about because it was getting close to Memorial Day and I was being proactive and thought that hot dogs might sell. I knew from memory that Kunzler sold hot dogs and had previously given me a price quote. As with the Indulac situation, I likely used my phone to check my Hoffmans email to find the price quote I remember having received, which I then was confirming with Kunzler. Also, like the Indulac situation, I could have just as easily called Kunzler directly and received the details about the hot dogs, as there was nothing proprietary or confidential about the hot dog pricing. Ultimately, McLane did not end up making any hot dogs purchase that year from Kunzler, and I believe it made a total of only one purchase from Kunzler of $4,594.00 in 2015.

The Trustee claims that this email proves that I made copies of "HTG's list of customers or customer data" (see Trustee's Statement of Material Facts at ¶ 63) but clearly the Trustee is once again completely mistaken. Kunzler is a vendor and never has been or would be a customer of the

Debtor. Furthermore, I did not ever make copies of HTG's customer list or customer data, as the information in Exhibit L was information that was already on my personal phone from a previous email.

10. I can unequivocally say that McLane never asked me to check my Hoffman's email account, or to forward any of those emails to myself, and I never forwarded or viewed any Hoffman's emails which contained information that I would not have been able to easily access through a phone call or internet search. Additionally, my access to my Hoffman's email was short term, as it was shut off in June 2013 for nonpayment to Google business.

11. In sum, as I have demonstrated above, none of the Exhibits submitted by the Trustee even comes close to supporting the conclusory and over-the-top allegations it makes in its "Statement of Material Facts." On numerous occasions, the Trustee incorrectly refers to vendors as customers, demonstrating its lack of understanding of the industry. Furthermore, none of the above emails contained any information about the Debtor's former customers, let alone evidence of trade secret information. Nor is there any evidence in these emails that McLane, either directly or indirectly, improperly obtained trade secret information.

WHEREFORE, your deponent respectfully requests the court to issue an Order directing the entry of summary judgment for the Defendants and against Plaintiff dismissing all of the causes of action alleged in the complaint, plus the costs and disbursements of this action, and for such other and further relief as to the court may seem just and proper.

*Jordan Laccetti*

Sworn to before me this 13
Day of October, 2016.

*Cassandra Check*

Notary Public

CASSANDRA CHECK
Notary Public, State of New York
Saratoga Co. #01CH6307356
Commission Expires July 7, 2018